# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. _____ - Civ

FREDERICK SIEGMUND, Derivatively On
Behalf of LINKWELL CORPORATION,

                             Plaintiff,

      v.

XUELIAN BIAN, WEI GUAN, SONG QIANG
CHEN, LING LI, METAMINING, INC.,
METAMINING NEVADA, INC.,
CD INTERNATIONAL ENTERPRISES, INC.,
CHINA DIRECT INVESTMENTS, INC., and
CAPITAL ONE RESOURCE CO., LTD.,

                          Defendants,

    -and-

LINKWELL CORPORATION,

                 Nominal Defendant.

_____/

## VERIFIED SHAREHOLDERS DERIVATIVE COMPLAINT

Plaintiff Frederick Siegmund, by his counsel, brings this shareholders derivative action

for the benefit of nominal defendant Linkwell Corporation ("Linkwell" or the "Company").  The

allegations in this verified complaint are made by Plaintiff upon personal knowledge as to his

own acts, and upon information and belief as to all other matters.  Plaintiff's information and

belief is based upon the investigation conducted by himself and his counsel, which includes the

review of filings with the Securities and Exchange Commission ("SEC"), news reports, press

releases, and other publicly available information.  Based on the allegations herein, Plaintiff

asserts derivative claims for breaches of fiduciary duty, aiding and abetting breaches of fiduciary

duty, constructive fraud, civil conspiracy, unjust enrichment and imposition of a constructive trust against members of the Company's Board of Directors (the "Board") and certain related and/or affiliated third parties for their misconduct during the period commencing February 13, 2012 through the present (the "Relevant Period"). Plaintiff seeks to recover damages on behalf of and for the benefit of Linkwell since defendants have failed, despite prior demand, to bring any action in connection with the misconduct alleged herein. Plaintiff also requests a statutory award of expenses, including attorney's fees, pursuant to Section 607.07401(6) of the Florida Statutes.

## I.    <u>SUMMARY OF THE ACTION</u>

1.     This action seeks damages in connection with an unfair, wrongfully accomplished reverse merger transaction (the "Transaction") that was designed to benefit the principals in the Transaction, rather than the Company and its public shareholders.

2.     Reverse mergers or reverse takeovers are generally used by private companies seeking access to capital markets in the United States. In a typical reverse merger transaction, an existing public shell company acquires all of the stock of a private operating company in exchange for a significant majority controlling interest in the public shell. The private operating company's management takes over the board of directors and management of the public shell company since the assets and business operations of the post-merger surviving public company are almost exclusively those of the former private company. The Transaction, however, was not the typical, garden variety reverse merger.

3.     Pursuant to the terms of the Transaction, the Board caused Linkwell – a public company with significant assets, operations and profits – to issue 9,000,000 shares of convertible preferred stock and 3,000,000 common stock warrants to Metamining Inc. ("Metamining") in order to acquire Metamining Nevada, Inc. ("Metamining Nevada") – a private shell company

2

with no assets, operations or meaningful prospects, and significant financial obligations – as a wholly owned subsidiary.

4.      Metamining was issued approximately 88% of Linkwell's equity.  China Direct Investments, Inc. ("China Direct") and Capital One Resource Co., Ltd. ("Capital One"), wholly owned subsidiaries of CD International Enterprises, Inc. ("CD Int'l") who acted as Metamining's and Linkwell's consultants in connection with the Transaction, were issued 581,973 shares of convertible preferred stock and 10,000,000 shares of common stock, respectively, equal to almost 6% of Linkwell's equity.

5.      The approval of the Transaction could not possibly constitute an appropriate exercise of business judgment.  Linkwell got nothing of meaningful value from the acquisition of Metamining Nevada in exchange for transferring an approximately 94% controlling interest in the Company to Metamining and two wholly owned subsidiaries of CD Int'l.  By contrast, Metamining obtained a public company with substantial cash, other current assets, manufacturing equipment, little debt and substantial net worth, and generating substantial and increasing revenues and earnings at essentially no cost.  The Transaction was the product of unfair self dealing by the Board, then consisting of Xuelian Bian ("Xuelian") and Wei Guan ("Wei"),[1] and the other principal shareholders of the Company, which permitted Metamining to obtain control of Linkwell at an entirely inadequate price.  Subsequently, Song Qiang Chen ("Chen") and Ling Li ("Ling"), directors and officers of Metamining and Metamining Nevada, became directors of Linkwell and ratified the Company's acquisition of Metamining Nevada.

6.      Xuelian and Wei, who were, upon information and belief, unhappy with the Company's inability to generate any substantial market interest in Linkwell's stock even though

---

[1] Chinese surnames or family name (last name), unlike in the United States, are placed before the given name (first name).

its subsidiary disinfectant business was financially solid and rapidly growing, agreed to a plan to spin off the assets and operations of the subsidiary business to themselves in exchange for their assent to the Transaction. Neither the plan, nor the compensation that these directors received in exchange for their shares, was disclosed by the Company in its filings with the SEC and press releases.

7.     As a result of the Transaction, the aggregate equity interests of Xuelian and Wei in Linkwell was reduced from 38.5% to approximately 3%. This reduction in their equity interests in Linkwell does not make sense unless Xuelian and Wei were somehow compensated for the subsidiary disinfectant business they built and contributed to the Company. Consistent with a plan to spin off assets and operations of Linkwell, immediately after the Transaction closed the results of the Linkwell subsidiary companies were eliminated from the Company's consolidated statements of operations and comprehensive income. The "disposition" of these assets and operations from the subsidiary disinfectant business did not go unnoticed by Plaintiff or the SEC staff and reappeared in a subsequent filing with the SEC, but with every indication that the disinfectant business would be spun off with little or no consideration to the Company. Accordingly, Plaintiff has included a claim for a constructive trust concerning the possession and control of the Linkwell stock certificates, evidencing ownership of 90% of its subsidiaries to ensure that when these assets are transferred to Xuelian, Wei, Ecolab Inc. ("Ecolab") or any other third party, Linkwell receives fair and reasonable payment.

8.     Moreover, in furtherance of the plan to defraud the Company and its public shareholders, Xuelian, Wei, Song, and/or Ling caused Linkwell to file materially misleading financial reports, information statements and press releases with the SEC to conceal these

defendants' wrongdoing.  The foregoing four defendants and Metamining were aided and abetted by and/or acted in concert with defendants CD Int'l, China Direct and Capital One.

## II.   BACKGROUND

9.   Prior to March 1, 2012, Linkwell, through two 90% owned subsidiaries operating in China was a growing and prosperous public company, engaged in the manufacture and distribution of disinfectant products.  Its officer and directors Xuelian and Wei owned or controlled approximately 38.5% of the Company's common stock.  Metamining was a privately owned company engaged in the mining and distribution of metal ore materials.  Metamining wanted to acquire a public company to raise capital.  It had no interest in being in the disinfectant business in China.  It formed a subsidiary, Metamining Nevada, to enter into a contract to purchase the mineral rights for some previously abandoned mining properties in northern Nevada for $14,250,000.

10.   CD Int'l was engaged in a similar business to Metamining and through its subsidiaries China Direct and Capital One provided merger advice and SEC consulting and related services to many Chinese companies trading in the U.S. stock markets, including Linkwell, whose directors and officers were not fluent in English, or were not familiar with the operations and regulations of U.S. public companies, SEC disclosure compliance and/or applicable state corporate law.

## III.   DERIVATIVE ALLEGATIONS

11.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the injuries suffered, and to be suffered, by Linkwell, the nominal corporate defendant, as a direct result of the misconduct alleged herein.  This is not a collusive action to confer jurisdiction this Court that it otherwise would not have.

12.     Plaintiff is and has continuously been an owner of Linkwell stock throughout the Relevant Period.

13.     At the time that this action was commenced, the Board was composed of defendants Xuelian, Wei, Song and Ling.

14.     This action is pursued derivatively on behalf of the Company inasmuch as the Board is grossly conflicted and has rejected both a books and records demand and a follow up litigation demand made by Plaintiff.

15.     On July 24, 2012, Plaintiff caused a books and records demand to be made upon the Company in order to investigate potential breaches of fiduciary duty and/or aiding and abetting breaches of fiduciary duty by the Board involving the misconduct alleged herein (the "Books and Records Demand"). A true and correct copy of the Books and Records Demand is annexed hereto as Exhibit A.

16.     By letter dated July 31, 2012, and signed by Defendant Xuelian, Linkwell acknowledged receipt of the Books and Records Demand, however, refused to provide Plaintiff with any of the requested materials. A true and correct copy of the July 31, 2012 Letter is annexed hereto as Exhibit B.

17.     By letter dated August 16, 2012, Plaintiff, through counsel retained to make a litigation demand pursuant to Section 607.07401 of the Florida Statutes, made a written demand upon the Board to bring this action (the "Demand Letter"). A true and correct copy of the Demand Letter is annexed hereto as Exhibit C. The Demand Letter requested, among other things, that the Board bring an action to redress the injuries suffered by Linkwell as a result of the misconduct alleged herein.

18.     By letter dated August 24, 2012, Linkwell acknowledged receipt of the Demand Letter, however, it refused to take any action to protect its only meaningful assets from divestiture for no or inadequate consideration.  A true and correct copy of the August 24, 2012 Letter is annexed hereto as Exhibit D.

19.     As of the date of the filing of this action, Linkwell has provided no further response, nor has it initiated any action to recover the substantial damages sustained by the Company.

## IV.     JURISDICTION AND VENUE

20.     The Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332(a)(2), because the plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     Venue is proper in this District because Linkwell is a Florida corporation with a registered agent in this District.  Additionally, substantial acts in furtherance of the alleged wrongdoings and/or their effects have occurred in this District.

## V.     THE PARTIES

### A.     Plaintiff

22.     Plaintiff Frederick Siegmund ("Plaintiff") is a current shareholder of Linkwell, and was a shareholder of the Company at the time of the misconduct complained of herein occurred.  Plaintiff is a citizen of the State of New York.

### B.     Nominal Corporate Defendant

23.     Nominal defendant Linkwell is a Florida corporation with a principal place of business and operations located in the People's Republic of China ("PRC" or "China").  Linkwell operates as a public holding company and its common stock is quoted on the Pink

7

Sheets under the trading symbol PINK: LWLL.  Until March 30, 2012, the Company's only business was the development, manufacture, sale and distribution of disinfectant health care products to the medical industry in China, primarily through its direct operating subsidiaries, Linkwell Tech Group Inc. ("Linkwell Tech") and Shanghai LiKang Disinfectant High-Tech Company, Limited ("LiKang Disinfectant").  All of the Company's business operations and employees are in China.

       **C.**    **Defendants**

24.    Defendant Xuelian has served as the Board Chairman, Chief Executive Officer and President of Linkwell since May 2005.  Xuelian has simultaneously served as Chief Executive Officer, President and a director of Linkwell Tech since its inception in June 2004, and as General Manager of LiKang Disinfectant since 1993.  Upon information and belief, Xuelian is a citizen of China.

25.    Defendant Wei has served as a member of the Board and Vice President of the Company since May 2005.  Wei has also served as the Vice President of Linkwell Tech since its inception in June 2004, and as Vice General Manager of LiKang Disinfectant since 2002.  Upon information and belief, Wei is a citizen of China.

26.    On or about May 2, 2005, Linkwell (f/k/a Kirshner Entertainment & Technologies, Inc.) did a reverse merger with Linkwell Tech and the company's two shareholders Xuelian and Wei to acquire all of the issued and outstanding stock of Linkwell Tech.  As a result, all of the substantial assets and operations of Linkwell Tech were now part of a publicly owned company trading on a United States stock market.

27.    Defendant Song has served as a member of the Board since March 30, 2012.  Song has also served as the Chairman of Metamining and Metamining Nevada since co-founding those companies in 2008 and 2011, respectively.  Song is a citizen of the State of California.

28.     Defendant Ling has served as a member of the Board since March 30, 2012. Ling, also a co-founder of Metamining and Metamining Nevada, has served as the President and a director of those companies since 2008 and 2011, respectively.  Ling is a citizen of the State of California.

29.     Defendant Metamining is a California corporation with a principal place of business in Foster City, California.  Metamining is a privately held mining development company that manages mines in the United States and develops a portfolio of mineral assets, including metallurgical coal, iron ore, copper and manganese ore.

30.     Defendant Metamining Nevada is a Nevada corporation with a principal place of business in Carson City, Nevada.  Prior to the Transaction, Metamining Nevada was a wholly owned subsidiary of Metamining.  Metamining Nevada was formed by Metamining on March 30, 2011 in connection with certain agreements to purchase mining and real property rights on approximately 4,500 acres in northern Nevada.  As a condition of that transaction, the sellers of the mineral rights required Metamining to incorporate Metamining Nevada as a vehicle to secure the sellers' interest and control over the transfer of the mining and real property rights until receipt of final payment.  Since its inception, Metamining Nevada has had no assets, operations or employees.  Metamining Nevada shares an interlocking management structure with Metamining.

31.     Defendant CD Int'l is a Florida corporation with its principal place of business in Deerfield Beach, Florida.  CD Int'l produces and distributes industrial commodities in China and the Americas.  These industrial commodities include: magnesium ingots, powder and scraps; synthetic chemicals; and steel products and non ferrous metals.  CD Int'l also provides business

and financial consulting services to public and private companies primarily operating in China. CD Int'l changed its name from China Direct Industries, Inc. in February 2012.

32.    In its Form 10-K for the year ended December 31, 2008, CD Int'l described itself as a U.S. company that manages a portfolio of Chinese entities and provides consulting services to Chinese businesses.  The company operates three identifiable business segments: Magnesium, Basic Materials and Consulting.  The Magnesium and Basic Materials segments were established in the fourth quarter of 2006, and were developed through the acquisitions of controlling interests of Chinese private companies.

33.    CD Int'l's Magnesium segment currently operates four magnesium facilities in China that produce and/or distribute pure magnesium ingots, powders and scraps.  The Basics Materials segment focuses on selling and distributing a variety of products in Asia including industrial grade synthetic chemicals, steel products, non ferrous metals, recycled materials and industrial commodities. The Consulting segment continues to provide a suite of consulting services to U.S. public companies that operate primarily in China.  The Consulting segment generates revenues by providing consulting services in the areas of financing structures and arrangements, mergers, acquisitions and other business transactions, identifying potential areas of growth, translation services, managing and coordinating all necessary government approvals and licenses in the PRC, marketing services, investor relations services, and coordination of the preparation of required SEC filings.

34.    On September 14, 2012, CD Int'l was delisted from The NASDAQ Stock Market LLC ("NASDAQ").  The delisting followed shortly after the company received a letter from the staff of the NASDAQ (the "NASDAQ Letter") which asserted that continued listing was no longer warranted because, among other things, the occurrence of manipulative trading activity in

the company's common stock.  As indicated in its April 27, 2012 Form 8-K filing, the NASDAQ

Letter stated:

> [T]he Staff believes that common stock purchases made in the open market by certain of [CD Int'l]'s executive management, board of directors, key employees, and their family members, and several related parties were improper in that they were a part of a concerted and coordinated effort to artificially support the price of the [c]ompany's securities over a brief period of time in September 2011 to enable [CD Int'l] to remain complaint with Nasdaq's $1.00 per share bid price requirement. The Staff also cited as an additional basis for delisting was CD [Int'l's] "failure to provide complete and accurate responses to Nasdaq's requests for information regarding the trading and funding of that trading in violation of Listing Rule 5250(a)(1).  The Staff stated that its delisting determination was based on the broad discretionary authority afforded to Nasdaq under Listing Rule 5101 in order to maintain the quality of, and the public's confidence in, Nasdaq.

35.     Defendant China Direct is a Florida corporation and a wholly owned subsidiary of

CD Int'l.  China Direct provides specialized business consulting services primarily to Chinese

companies seeking access to the U.S. capital markets.  China Direct shares an interlocking

management structure with CD Int'l.  It also shares the same office space with CD Int'l in

Deerfield Beach, Florida.  Since 2005, China Direct has been engaged as a consultant for

Linkwell to advise management in areas related to marketing and operational support in the

United States, media and public relations, mergers and acquisitions, financial advisory and SEC

disclosure compliance.  Under the terms of their consulting and management agreement(s),

China Direct received Linkwell common stock and common stock warrants as compensation for

the services rendered.  China Direct is also the registered agent of Linkwell in the State of

Florida.

36.     CD Int'l acquired China Direct in August 2006.  With the addition of China

Direct to its business portfolio, CD Int'l also acquired Linkwell as a client.

11

37.     Defendant Capital One is a Brunei company with a principal place of business in China.  Capital One is a wholly owned subsidiary of CD International.  Capital One provides specialized business consulting services primarily to Chinese companies seeking access to the U.S. capital markets. These business consulting services include, without limitation, translation services, management of professional resources, identification of potential acquisition targets and investment sources, development of marketing plans and coordination of public disclosures.

38.     Defendants Xuelian, Wei, Song and Ling are sometimes collectively referred to as "Director Defendants."   Defendants CD Int'l, China Direct and Capital One are sometimes collectively referred to as "CD Defendants."   Director Defendants, Metamining and CD Defendants are sometimes collectively referred to as "Defendants."

39.     Because of their positions with the Company and substantial direct and indirect ownership of Linkwell stock, Director Defendants had the power and authority to cause and did cause Linkwell to engage in the misconduct complained of herein without seeking shareholder approval.  Director Defendants had the power and authority to enter into and then ratify the Transaction, and control the contents of the Company's public statements to the financial marketplace concerning the material terms of the Transaction and the materially misleading SEC filings discussed herein.

40.     CD Defendants, in their capacity as consultants for Linkwell and Metamining to advise management in areas related to, among other things, the Transaction and SEC disclosure compliance during the Relevant Period, had the power and authority to and did aid and abet Director Defendants in the misconduct complained of herein.

## VI.     RELEVANT NON-PARTY

41.     Yuejian (James) Wang, Ph.D. ("Wang") is the Chairman and Chief Executive Officer of CD Int'l and China Direct.  Dr. Wang has served as Chairman and Chief Executive

Officer of CD Int'l since August 2006.   He co-founded China Direct and has served as its Chairman and Chief Executive Officer since January 2005.

42.     Ecolab is a Delaware corporation whose stock trades on the New York Stock Exchange under ticker symbol ECL.  Ecolab develops and markets products and services for the hospitality, foodservice, healthcare and industrial markets.  The company provides cleaning and sanitizing products and programs, as well as pest elimination, equipment maintenance and repair services primarily to customers in the foodservice, food and beverage processing, hospitality, healthcare, government and education, retail, textile care, commercial facilities management and vehicle wash sectors.  As more fully described in paragraphs 60-62 below, Ecolab, pursuant to a stockholders agreement with Linkwell, has a call right, exercisable upon a change of control at the Company, to purchase all of its equity interests in Linkwell Tech and any other affiliate owned by Linkwell.

## VII.    DUTIES OF DIRECTOR DEFENDANTS

43.     Each Director Defendant owed the Company and its shareholders the fiduciary duties to act in good faith, with due care, and in the best interests of the corporation.  The conduct complained of herein involves culpable violations by the Company's directors of their fiduciary obligations.   The misconduct of the Xuelian and Wei, who also served as the Company's executive officers during the Relevant Period, including authorizing the Transaction and executing the agreement to acquire Metamining Nevada, have been ratified by the other Board members Song and Ling.

44.     By reason of their positions as officers, directors and fiduciaries of Linkwell, and because of their ability to control the business and corporate affairs of the Company, Director Defendants owed Linkwell and its public shareholders fiduciary duties of candor, trust, loyalty and due care, and were required to use their ability to control and manage Linkwell in a fair, just,

honorable and equitable manner, to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally, and not in furtherance of their own personal interests or benefits. Furthermore, as officers and/or directors of a publicly held company, Director Defendants have a duty to refrain from utilizing their control over Linkwell to divert assets to Xuelian and Wei via improper and/or unlawful practices.

45.     Each director and officer of Linkwell named herein owed the Company and its public shareholders the fiduciary obligation to act in good faith, with due care, loyalty and diligence in the management and administration of the Company's affairs, as well as in the use and preservation of its property and assets, and the highest obligations of fair dealing.

46.     By reason of their positions at Linkwell, each of the Director Defendants had the power and authority to control the contents of the Company's public statements to the financial marketplace, including the Company's false Form 10-Qs, press releases, proxy statements and information statements (collectively, "public filings") discussed herein.

47.     Because of their positions at Linkwell, each of the Director Defendants was aware of the wrongful conduct complained of herein, had access to adverse non-public information and was required to disclose such facts promptly and accurately to the Company's shareholders and the financial markets, however, each failed to do so.

48.     Each of the Director Defendants, because of their advisory, executive, managerial and directorial positions with Linkwell, had access to adverse, non-public information about the financial condition and operations of the Metamining Nevada, access to internal corporate documents, reports and other information, including adverse, non-public information about the business, financial condition and future prospects, and attended management and/or board of

directors meetings.  Each of the Director Defendants was responsible for the truthfulness and accuracy of the Company's public reports, statements and releases.

49.    Each of the Director Defendants directly participated in the management, administration and/or oversight of Linkwell and was privy to confidential, proprietary information about its business operations and accounting practices.  They were involved or participated in drafting, producing, reviewing, approving and/or disseminating the false and misleading statements alleged herein and were thus aware that the statements were being made, and approved and ratified them in violation of the applicable laws, rules and regulations.

50.    To discharge their duties, each of the Director Defendants was required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of the Company.  By virtue of such duties, the Director Defendants were obligated to, among other things:

a.    Manage, conduct, supervise and direct the business affairs of Linkwell in accordance with all applicable laws (including federal and state laws, government rules and regulations);

b.    Neither engage in self-dealing, nor knowingly permit any officer, director or employee of Linkwell to engage in self-dealing;

c.    Neither violate, nor knowingly permit any officer director or employee of Linkwell to violate, applicable laws, rules and regulations;

d.    Prudently protect the Company's assets, and to ensure that the Company is paid an appropriate price for the sale of its assets or operations;

e.    To not permit Linkwell to issue more than 90% of its equity in exchange for a shell company with no or grossly inadequate consideration;

f.      Exercise control and supervision over the public statements to the securities markets trading in Linkwell stock by the officers and employees of the Company; and

g.      Supervise the preparation and filing of an financial reports or other information required by law from Linkwell, examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning each of the subjects and duties set forth above.

## VIII.   ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.      Background

#### 1.      Linkwell

51.      At all relevant times, Linkwell has engaged in the development, manufacture, sale and distribution of disinfectant health care products to the medical industry in China through its direct subsidiaries Linkwell Tech and LiKang Disinfectant.

52.      Linkwell is the direct parent of Linkwell Tech, owning 90% of that company's stock.  The remaining 10% of Linkwell Tech is owned by Ecolab.  Linkwell Tech owns 100% of LiKang Disinfectant.

53.      LiKang Disinfectant's products are sold on a wholesale and retail basis to the medical community in China.  It has 66 marketed products, 46 of which are certified by one or more of the following Chinese government authorities: the Chinese Ministry of Health, the State Food and Drug Administration and the Ministry of Agriculture.  The Ministry of Health, the authority which approves products that require the highest level of licensing, has granted LiKang Disinfectant 31 hygiene licenses.  Accordingly, the Company refers to itself on its corporate website as the "No. 1 disinfectant brand in China."

16

54.     Products manufactured by LiKang Disinfectant accounted for more than 99% of the Company's total net revenues for fiscal year ended December 31, 2011.

55.     As stated by the Company in its Form 10-K for fiscal year ended December 31, 2011, filed on March 30, 2012 ("2011 Form 10-K"): "According to the China Federation of Industrial Economics, China's disinfectant industry is estimated to be well over $6.5 billion annually.  The disinfectant industry in China may be characterized as an emerging industry, populated by approximately 1,000 small domestic manufacturers and distributors, and half a dozen large international companies with limited presence and products."

56.     Linkwell's principal strengths in the Chinese disinfectant industry differentiate Linkwell from its competitors.  According to the 2011 Form 10-K, those strengths are:

     a.     "Strong sales and distribution network in China – This enables us to compete effectively with domestic competitors, as well as larger foreign-owned competitors."

     b.     "Product selection and availability – A number of our competitors are smaller, regional companies with a limited number of product offerings.  We offer our customers a wide variety of disinfectant products and the ability to ship products to our customers on a timely basis throughout the PRC."

     c.     "Research and development – Our efforts to respond to market demand for new products have resulted in the issuance to us of 31 hygiene licenses by the Ministry of Public Health.  Based upon our knowledge of our competitors, we do not believe any of our competitors have received as many licenses since the enactment of the licensing standards in July 2002."

     d.     "Strong product pipeline – We have a history of introducing three or four new products to the market each year. We have filed applications for four new products and have eight additional products in development."

      e.     "Manufacturing capacity – We are operating at 50% capacity to produce GMP (Good Manufacturing Practice) certified products and we have the ability to increase capacity significantly at moderate costs."

      f.     "Customer service – Our sales personnel are thoroughly educated about our products, which enable them to better understand the needs of our customers.  Our customer service representatives strive to answer questions immediately and, at a minimum, no later than 24 hours after a customer's inquiry."

      g.     "Reliability and speed of delivery. We believe our products have developed a reputation of good quality and effectiveness and our manufacturing capabilities enable us to produce and ship products to our customers promptly."

      h.     "Price – We have developed relationships with a number of raw material suppliers which enables us to reduce our costs and thereby offer competitive prices to our customers."

57.     Linkwell, through LiKang Disinfectant, has more than 6,000 active and recurring customers in China, including hospitals, clinics, health centers, medical suppliers and distribution companies.

58.     Bolstered by this strong customer base, Linkwell's total net sales for fiscal year ended December 31, 2011 were almost $17 million,[2] more than a 25% increase over its prior year's performance.  Gross profits were $7,428,520 and net income was approximately $1.88 million, a 101.2% increase over 2010.

59.     As of December 31, 2011, the Company had cash and cash equivalents of $2,919,670, accounts receivable of $12,651,347, total assets of $27,446,588, total liabilities of

---

[2] All dollar figures are in U.S. dollars.

$10,012,087, total stockholders' equity of $17,434,501, and working capital of $1,997,311 with no material commitments for capital expenditures.

## 2.    Ecolab

60.    Before the Relevant Period, on May 30, 2008, Linkwell, Linkwell Tech and Ecolab entered into a stockholders agreement ("Stockholders Agreement"), whereby Linkwell and Ecolab are subject to certain pre-emptive rights, transfer restrictions and take along rights related to the shares of Linkwell Tech each entity holds.

61.    Pursuant to the Stockholders Agreement, Ecolab has a call right which is exercisable upon the entry of Linkwell into any change of control transaction.  The call right requires the Company to sell Ecolab all of its equity interests in Linkwell Tech and any of the affiliates owned by Linkwell.

62.    Ecolab may exercise its call right by providing written notice to Linkwell and Linkwell Tech no later than 30 days after receipt of notification of change in control from Linkwell.  In the event that Linkwell and Ecolab are unable to agree to the value of the equity interests in any of the Company's operating subsidiaries, the value of such interests shall be determined by an independent third party.  The call right is described in the Stockholders Agreement as follows:

> If Linkwell is subject to a Change of Control Transaction, Linkwell shall within five business days thereof notify Ecolab in writing of the same and Ecolab shall have the right (the "Call Right") to require Linkwell to sell, and Linkwell shall be obligated to sell and to cause its Affiliates to sell, all of the equity interests then owned by Linkwell and its Affiliates in any Group Member (the "Call Shares").  Ecolab may exercise the Call Right by providing written notice (the "Call Notice") to Linkwell and the Company by no later than the date falling thirty (30) days after its receipt of notification of the Change of Control Transaction from Linkwell.  The purchase price for the Call Shares shall be agreed between Ecolab and Linkwell, provided, that, if agreement has not been reached within thirty (30) days after Linkwell's receipt of the

Call Notice, either party may by notice to the other (the "Valuation Notice") require a price for the Call Shares to be established by an independent certified public accountant (the "Valuer") (acting as an expert and not as an arbitrator). ... The Valuer shall determine the fair price of the Call Shares being sold on a going concern basis between a willing seller and a willing purchaser and on the basis that each Call Share, whatever its class, has the same value corresponding to its proportion of the value of all the Call Shares taken as a whole and that no additional or reduced value is attached to any holding of Call Shares by virtue only of that holding comprising or after purchase conferring or giving rise to a majority or minority of the total issued share capital of the Company. ...

### 3.   CD Defendants

63.    Upon information and belief, CD Defendants designed and were the principal moving force behind the Transaction.  The basis for the information and belief is as follows:

a.    CD Defendants served as consultants for both Linkwell and Metamining in connection with the Transaction, and received, on an as converted basis, approximately 6% of the Company's stock;

b.    The disclosure in the Company's 2011 Form 10-K that Linkwell's management is located in China, are not fluent in English, are unfamiliar with the operations and regulations of U.S. public companies and, thus, are heavily dependent upon its U.S. advisors, CD Defendants, for consulting services referenced above; and

c.    These same services along with the SEC filing services are specifically touted in CD Int'l's filings with the SEC.

### B.   The Transaction

64.    On April 2, 2012, Linkwell announced in a press release filed a Form 8-K that the Company had entered into a definitive share exchange agreement (the "Share Exchange Agreement") with the Metamining to acquire Metamining Nevada as a wholly owned subsidiary, in exchange for 9,000,000 shares of newly issued Series C convertible preferred stock and

3,000,000 warrants to purchase common stock.  The press release set forth that after the effective date there would be a reverse stock split of all of the outstanding shares of the Company's common stock at a ratio of 1 for 200 so that the Series C preferred is convertible into 9,000,000 shares of common stock would give Metamining approximately 90% of the equity.  The 3,000,000 warrants to purchase common stock are exercisable for a period of 5 years from the date of issuance at $5.00 per share.  Xuelian commented in connection with the acquisition: "We are extremely pleased to have entered into this agreement to acquire Metamining Nevada and enter into a new era for our company. We are confident that this acquisition will become a tremendous long term growth opportunity for our company and we intend to work diligently to unlock the vast potential of these mining properties for our shareholders."

65.     The announcement was greeted by shock and surprise by Plaintiff, one of the Company's public shareholders, for a number of reasons.

66.     First, the Company's public shareholders had no knowledge that Linkwell was even considering a strategic merger, let alone one with a company in an entirely dissimilar line of business – the exploration, mining and trading of iron ore.  Moreover, given the relative strength of the Company as the No. 1 disinfectant brand in China, and in depth of knowledge and experience of management in that specific area, there was no apparent business purpose to support the acquisition.

67.     Second, the determination by the Board (then comprised of Xuelian and Wei) to acquire Metamining Nevada was entirely inconsistent with the disclosures made by Linkwell to its shareholders less than a month before.  On March 9, 2012 (at approximately the same time the Transaction was being negotiated), Linkwell informed shareholders in a Definitive Information Statement on Schedule 14C that it would effect a reverse stock split of its common stock of 1

share for every 30 outstanding shares. According to the Information Statement, on February 13, 2012, the Board adopted and approved the reverse stock split in an amendment (the "Charter Amendment") to the Company's Articles of Incorporation. The Board determined this action to be in the Company's best interest because it believed that the Company's common stock is undervalued and the reverse split will allow the common stock to trade in a "more realistic price range." Director Defendants knew or should have known that the acquisition of Metamining Nevada for over 90% of its equity would have a negative effect on the Company's stock price, rather than correct the asserted undervaluation. As described below, the manifestly unfair Transaction had a negative effect on the Company's stock price which declined from $0.10 per share to $0.005 per share prior to the effective date of the 1 for 200 reverse stock split.

68.    Third, Linkwell did not obtain a fairness opinion in connection with the acquisition of Metamining Nevada, as to the appropriate consideration Metamining should have paid for approximately 90% of the Company's equity.

69.    Fourth, the issuance of new equity in connection with the Transaction also affected Xuelian and Wei who, at the time, beneficially owned 39,023,470 shares of the Company's common stock, or 38.79% of the shares outstanding. Under the terms of the Transaction, the number of shares of common stock beneficially owned by Xuelian and Wei would be reduced to less than 3% of the shares outstanding. It did not make sense that Xuelian and Wei, who have collectively devoted approximately 57 years to running Linkwell's operating subsidiaries, Linkwell Tech and LiKang Disinfectant, would walk away with almost nothing in return from the Transaction.

70.    The only plausible reason for their actions was that Xuelian and Wei obtained something of value in exchange for their agreement to execute the Share Exchange Agreement

and reduce their equity interest in Linkwell.  As more fully described below, and, in particular, paragraphs 85, 101, 109-10 and 123-24, the plan was that Xuelian and Wei would not pay anything for all of the historic assets and operations of Linkwell.

### 1.    The Terms of the Transaction

71.    On April 4, 2012, Linkwell announced in a Form 8-K filing with the SEC that it acquired Metamining Nevada from Metamining on March 30, 2012.  According to the filing, Metamining Nevada is a "development stage company" that Linkwell acquired to exploit certain mining and real property rights Metamining possessed on properties located in Nevada pursuant to certain purchase and sale agreements (described below) executed by the parties.  Pursuant to the terms of the Share Exchange Agreement, Linkwell acquired 100% of the capital stock of Metamining Nevada in exchange for 9,000,000 shares of the Company's Series C convertible preferred stock and 3,000,000 Series C common stock purchase warrants issued to Metamining.

72.    As a condition precedent to Metamining consummating the Transaction and exchanging its Metamining Nevada shares for the Linkwell securities, Linkwell was required, among other things, to: (a) appoint 2 directors designated by Metamining; and (b) issue certificates representing 581,973 preferred shares to certain designated entities.

73.    On March 29, 2012, the Company filed Articles of Amendment to its Articles of Incorporation ("Articles of Amendment") wherein the Board (composed of Xuelian and Wei), by unanimous written consent, adopted a resolution providing for the issuance of 9,581,973 shares of Series C convertible preferred stock.

74.    On March 30, 2012, Linkwell appointed Song and Ling to the Board.  On the same date it issued 581,973 shares of Series C convertible preferred stock to China Direct for services rendered on behalf of Metamining in connection with the Transaction.

75. Upon information and belief, Metamining, at the insistence of CD Defendants, also required that the 1 for 200 reverse stock split be a part of the Transaction. The 1 for 200 reverse stock split, became effective after the Transaction was completed and was also important to Song, Ling, Metamining and CD Defendants to correct the dilutive impact of the issuance of 9,581,973 shares of Series C convertible preferred stock in the Transaction. It also formally gave Metamining absolute voting control and, was designed to ensure that the Company's stock, after the effective date of the 1 for 200 reverse stock split, traded above $1 per share in order to trade on a national exchange.

76. Defendants were intimately aware that establishing and maintaining a stock price in excess of the $1 per share threshold was essential to Linkwell's ability to raise money from the U.S. capital markets. At the time of the Transaction, the Company's common stock did not have an established trading market stock price and was traded on the Pink Sheets. Moreover, CD Int'l was in the process of being delisted from NASDAQ in connection with its inability to comply with the $1 per share bid price requirement of the exchange.

### 2. The Grossly Inadequate Consideration for the Transaction

#### a) The Purchase and Sale Agreements

77. On April 15, 2011, Metamining entered into purchase and sale agreements (the "Purchase and Sale Agreements") with Little Valley Group, LLC, Greater Nevada Ranches, LLC and Western Resources Group, LLC (the "Sellers") to acquire rights to mining claims, together with certain real property rights on approximately 4,500 acres in northern Nevada (the "Nevada Properties"), during a two-year period, for an aggregate purchase price of $14,250,000 (the "Purchase Price").

78. The Purchase Price is payable in 3 installments payments. The first installment payment includes an initial down payment in the approximate amount of $3,000,003, payable in

3 partial payments.  The Sellers acknowledged in the Purchase and Sale Agreements that they received a "review" payment in the amount of $234,567.53 on December 28, 2010.  A pre-payment in the amount of $500,000 is to be made to the Sellers within 10 days after execution of the Purchase and Sale Agreements, and the balance of the down payment ($2,265,435.60) is due 45 days after the pre-payment.  The second installment payment, in the amount of $5,625,000 is due on April 15, 2012.  The third installment, in the amount of $5,625,000, is due on April 23, 2013.  If any portion of the purchase price is not paid when due, subject to certain extensions, any amount previously paid is forfeited and the Purchase and Sale Agreements will be terminated.

79.      In March 2012, prior to the execution of the Share Exchange Agreement, Metamining was already well behind on completing its *first* installment payment to the Sellers for the Nevada Properties.  On March 19, 2012, Metamining entered into a first extension agreement with the Sellers, pursuant to which, the payment of $150,000 was due by April 15, 2012, the payment of an additional $150,000 is due by April 30, 2012, and the due date of April 15, 2012 payment of $5,625,000 was extended to June 15, 2012.  Additionally, the aggregate payment of $300,000, due on April 30, 2012, was to be applied to the $5,625,000 installment balance due on April 15, 2013.

80.      The April 4, 2012 Form 8-K filing advised shareholders that Linkwell will need to raise additional capital to pay the Purchase Price.  Linkwell has no rights under the terms of the Share Exchange Agreement to recover the shares paid to Metamining in connection with the Transaction if the Purchase and Sale Agreements are terminated for non-payment.

81.      Metamining Nevada, notably, is not a signatory to any of the Purchase and Sale Agreements.  Before the Purchase and Sale Agreements were executed, Metamining was

required to form a Nevada incorporated operating company (Metamining Nevada) to receive title of the mineral and mining rights so as to secure the Sellers control over the transfer of the Nevada Properties until the full payment of the Purchase Price. The Sellers were empowered to appoint one person to the board of directors of Metamining Nevada "with certain and sufficient influence ... to control the transfer of the [Nevada] Properties ... and provide for the recovery of [the same] in the event of failure to execute or termination ...." Upon final payment of the Purchase Price, the Sellers "will immediately relinquish and surrender all interest in [Metamining Nevada] and resign the board position ...."

b)      Metamining Nevada

82.     On May 11, 2012, Linkwell filed an amendment to its April 4, 2012 Form 8-K filing. The amended filing provided the following financial statements and other information: (a) the audited financial statements of Metamining Nevada as of December 31, 2011 (the "Audited Financial Statements"); and (b) pro forma financial information for Linkwell for the fiscal year ended December 31, 2011.

83.     The Audited Financial Statements of Linkwell reflected an absence of assets on the balance sheet of Metamining Nevada and no revenues on the statement of income.

84.     Note 1 in the Audited Financial Statements nevertheless described Metamining Nevada as an active business operation, which currently owns mining rights on the Nevada Properties, and that the Nevada Properties hold promising future prospects. Note 1 provides, in relevant part, the following:

> Metamining Nevada, Inc. (the "Company") was incorporated in the State of Nevada on March 30, 2011, whose primary business operations are the exploration, mining, and processing of mineral deposits from iron ore resources located in the State of Nevada. The Company is a wholly-owned subsidiary of Metamining Inc., a California corporation, whose principal offices are located at 1065 East Hillsdale Boulevard, Foster City, CA 94404.

26

Metamining Nevada, Inc. purchased and holds mining rights for some of the largest iron ore resources in the western United States. The Company has plans to make substantial investments to explore, mine, and process these iron ore resources. The Company controls approximately 7.5 square miles of iron properties containing defined resources in the Buena Vista Hills area of the Mineral Basin Mining District, Pershing and Churchill Counties, of Nevada.

The Company's founders have identified and purchased several mineral deposits in northern Nevada. These resources were operating mines at some time since the 1800's, but production had ceased for many years. The Company's founders have plans to restart these mines, applying the latest and most modern mining and refining techniques to meet global demand for iron and steel.

The Company is a development stage enterprise, and management has engaged the services of several engineering consultants to study and report on the mining assets, and to develop plans to enable the firm to capitalize on opportunities to mine and process the iron ore resources.

One of the primary mineral deposit sites under the Company's control is Iron Horse Project, which is located 21 miles south of Lovelock, Nevada, in the County of Pershing. Based on historical geological studies, it is estimated that there is 112 million tons of iron ore in surface stockpiles and underground bodies indicated by drilling proven resources, with iron ore grade between 30 to 40% iron. Potential resource estimates are 450 million tons of iron ore, based on examination of magnetic data and local and district geology with a grade of 20 to 30% iron to a depth of 475 feet.

The Company engaged the services of certain professional geologist to make a site visit and to compile a Technical Report on February 20, 2011 on Buena Vista Iron Properties in Pershing and Churchill Counties, Nevada. The Report summarized data available as regards past exploration and mining, as well as current identified, inferred and potential iron resources based on available information and geologic interpretations.

By July 20, 2011, the Company engaged the services of certain professional engineering firm to make a site visit and to review existing data, and provide a pre-feasibility study of the iron ore deposits of the Dodge Mine Property located east of Lovelock, Nevada. No exploration work was conducted so that this report relies entirely on work done by past operators and consultants. This Report is a pre-feasibility study that is not based on

significant measured reserves but does show tremendous potential for development of the property. This Report only addresses the Dodge Mine Property within the overall Iron Horse Property holdings controlled by Metamining.   However, past magnetite studies and other data indicate the potential for very large magnetite deposits on these tracts, in the order of hundreds of million tonnes, possibly over one billion tonnes as described in the geologic report.  The Professional Engineers were tasked with the responsibility to gather and review all available data and to make preliminary assessments and recommendations based on that data, culminating in the "Iron Horse Project – Dodge Mine Pre-Feasibility Study". In that report, the Professional Engineers describe the geological composition and physical characteristics of the property, the opportunities for mining and processing, infrastructure and cost considerations, productivity estimates, and cash flow and rates of return modeling for management's consideration. The study concludes that the Dodge Mine has substantial potential to be a major producer and extremely profitable.  The Report completed in August, 2011.

**C.      Linkwell Makes Additional Disclosures about the Transaction**

85.      On May 15, 2012, Linkwell filed its quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC which failed to report any results from the operations of its subsidiary disinfectant business or its significant assets in the consolidated statements of operation. *They just disappeared.*  The consolidated statement provides as follows:

**LINKWELL CORPORATION AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME**
**(UNAUDITED)**

| | Three Months Ended March 31, 2012 | From Inception (March 30, 2011) to March 31, 2011 |
|---|---|---|
| NET SALES | $                - | $                - |
| COST OF SALES | - | - |
| GROSS PROFIT | - | - |
| OPERATING EXPENSES: | | |
| Selling expenses | - | - |
| General and administrative | 26,670 | - |
| Total Operating Expenses | 26,670 | - |
| OPERATING INCOME (LOSS) | (26,670) | - |

| | | | |
|---|---|---:|---:|
| INCOME BEFORE INCOME TAX | | (26,670) | - |
| INCOME TAX EXPENSE | | - | - |
| NET INCOME | | (26,670) | - |
| COMPREHENSIVE INCOME (LOSS): | | | |
| Net income | | (26,670) | |
| Foreign currency translation | | - | - |
| COMPREHENSIVE LOSS | | $ (26,670) | $ - |
| BASIC AND DILUTED INCOME PER COMMON SHARE: | | | |
| Basic earnings per shares | | $ - | $ - |
| Diluted earnings per shares | | $ - | $ - |
| WEIGHTED AVERAGE SHARES OUTSTANDING: | | | |
| Basic | | - | - |
| Diluted | | - | - |

86.     The Form 10-Q also provided a disclosure of risk factors faced by the Company which informed the Company's public shareholders that, among other things, if there is a default in paying the Purchase Price in connection with the Purchase and Sale Agreements, Linkwell will lose its rights to explore and develop the Nevada Properties and that management may not be able to effectively integrate the businesses of Linkwell's subsidiaries Metamining Nevada and Linkwell Tech.  The risk disclosures in the Form 10-Q are as follows:

*If we do not timely pay the amounts due for the purchase of the mining and real property rights we will lose our ability to develop those rights and diversify our obligations. We do not have the funds to pay these obligations and there are no assurances we will be able to raise the necessary capital.*

Under the terms of the purchase agreements for the mining and real property rights, Metamining Nevada must pay the sellers $13,950,000 for the purchase of the mineral and real property rights, of which $5,325,000 is due by June 15, 2012 and the balance of $5,625,000 is due by April 15, 2013. Until such time as Metamining Nevada has made these payments, the sellers are holding the deeds in escrow.  We do not have the funds necessary to make the June 15, 2012 payment. If we fail to make this payment, we will lose these rights.  In addition, if we are able to

29

either secure the funds necessary to make these payments or otherwise negotiate an extension of the due dates, of which there is no assurance, we will lose all rights to develop these properties and forfeit any funds paid to date.

**We will need to raise between $15 million and $20 million of additional financing to develop the Metamining Nevada properties. If we cannot raise additional capital as needed, our ability to diversify our company could be in jeopardy.**

In addition to the funds necessary to pay for the mineral and property rights, we will also need to raise between $15 million and $20 million of capital to develop these properties. We do not have any firm commitments to provide any additional capital and we anticipate that we will have certain difficulties raising capital given the risks associated with developing the mining assets and the history of our company. Accordingly, we cannot assure you that additional capital will be available to us upon terms acceptable to us, if at all. If we are subsequently unable to raise additional funds as needed, our ability to implement our business plan and grow our company will be in jeopardy and investors risk losing their entire investment.

**Our management may be unable to effectively integrate our two businesses and to manage our growth and we may be unable to fully realize any anticipated benefits of the transaction with Metamining Nevada.**

We are subject to various risks associated with our growth strategy, including the risk that we will be unable to effectively integrate and manage the operations of Linkwell Tech with Metamining Nevada. The two companies' histories, the geographical location, business models and business cultures are different in many respects. Our management faces significant challenges in their efforts to integrate these businesses and to effectively manage our continued growth. There can be no assurance that our efforts to integrate these operations will be successful which may cause increased operating expenses and adversely impact our financial condition in future periods.

87.    Significantly, there was no discussion of the disinfectant business.

88.    On May 29, 2012, Linkwell filed a Preliminary Information Statement on Schedule 14C which disclosed that, on May 24, 2012, the Board, comprised of Xuelian, Wei, Song and Ling, adopted and approved the Articles of Amendment: (a) to effect the 1 for 200

reverse stock split, rather than the previously disclosed ratio of 1 for 30; and (b) to change the corporate name of the Company to Sun Sage Resources, Inc.

89.     This Information Statement set forth that the Company's principal shareholders, holding "60.1% of our outstanding voting securities have approved these actions on June [7], 2012, by written consent in lieu of a special meeting of shareholders in accordance with the relevant provisions of the Florida Business Corporations Act."

90.     As of May 24, 2012, Linkwell had 119,605,475 shares of common stock and 9,581,973 shares of Series C convertible preferred stock outstanding.   The Articles of Amendment were approved by the holders of 73,955,443 shares of the Company's common and preferred stock.   The holders of the voting securities that were stated to have approved these actions by written consent in lieu of a special meeting include Xuelian, Wei and Song, Metamining and CD Defendants.

91.     Xuelian, Wei, Song, Metamining and CD Defendants, who beneficially own 65,605,443 shares of the Company's common and preferred stock, or approximately 55% of the shares outstanding, were stated to have voted to approve the amendment.   According to the Information Statement, Song has voting and investment power over 9,000,000 shares of the Series C convertible preferred stock owned by Metamining.   CD Int'l has voting and investment power over 10,000,000 shares of the Company's common stock, and 581,973 shares of the Series C convertible preferred stock.

92.     The 10,000,000 shares of common stock are held of record by Capital One.   The shares were issued by Linkwell to Capital One in 5,000,000 share increments on March 12, 2012 and March 29, 2012, as compensation for advising Linkwell "on strategic growth, merger and

acquisition, and investor relationship." Capital One provided the foregoing services to Linkwell at the same time the Transaction was being negotiated and closed.

93.     The 581,973 shares of convertible preferred stock are held of record by China Direct.  As detailed above, these shares were issued to China Direct for services rendered to Metamining in connection with the Transaction.

94.     Both Capital One and China Direct are wholly owned subsidiaries of CD Int'l. Relevant non-party Wang has voting and dispositive control over the Linkwell common stock held by Capital One and China Direct.

95.     The Information Statement advised shareholders that, on the effective date, the 1 for 200 reverse stock split would reduce the number of issued and outstanding shares of the Company's stock from 119,605,475 shares to approximately 598,027 shares.

96.     The Board's stated reason for the 1 for 200 reverse stock split was the belief that the "current low price of our common stock negatively impacts our credibility as a viable business enterprise."  Additionally, as Linkwell required "significant additional capital to fund our operations following the transaction with Metamining Nevada," it similarly believed that the low trading price of the common stock adversely impacts the ability of the Company to raise the necessary funds and impairs the acceptability of the common stock to the investing public.  The Board also believed that a change of the Linkwell corporate name was appropriate to reflect the diversity of the business following the close of the Transaction.

97.     On July 26, 2012, Linkwell filed a Preliminary Information Statement on Schedule 14C which disclosed that, on May 24, 2012, and as amended on July 17, 2012, the Board adopted and approved the Articles of Amendment.

98.     This Information Statement disclosed that "the holders of 60.1% of [the Company's] outstanding voting securities have approved these actions on June [*], 2012, by written consent in lieu of a special meeting of shareholders, by written consent in lieu of a special meeting of shareholders in accordance with the relevant provisions of the Florida Business Corporations Act."   The holders of the voting securities that were stated to have approved these actions by written consent in lieu of a special meeting include Xuelian, Wei, Song, Metamining and CD Defendants.

99.     Again, the Board expressed that the reason for the 1 for 200 reverse stock split is the continued belief that the "current low price of our common stock negatively impacts our credibility as a viable business enterprise[,] … we need to raise significant additional capital to fund our operations following the transaction with Metamining Nevada" and the low trading price of the common stock adversely impacts the ability of the Company to raise the necessary funds and impairs the acceptability of the common stock to the investing public.

**D.     The Truth about the Transaction Is Belatedly Disclosed**

100.     On July 26, 2012, Linkwell filed an amendment to its quarterly report for the period ended March 31, 2012 on Form 10-Q/A with the SEC.   The amendment was filed in response to comments for the staff of the SEC and intended to address, among other things, certain risks faced by the Company as a result of the Transaction.   Notably, the amended risk factors disclosed that the Metamining never commissioned or received feasibility studies or obtained operating permits to either explore or mine the mineral rights on the Nevada Properties. Moreover, substantial feasibility work and capital was required just to demonstrate economic viability.   Even further, the filing disclosed that the Company may not be able to establish sufficient mineral reserves to ever justify commercial operations on the Nevada Properties.

101.    The amended risk factors (with modifications from the prior underscored) provide

as follows:

*If we do not timely pay the amounts due for the purchase of the mining and real property rights we will lose our ability to explore these properties and diversify our operations. We do not have the funds to pay these obligations and there are no assurances we will be able to raise the necessary capital.*

Under the terms of the purchase agreements for the mining and real property rights, Metamining Nevada must pay the sellers $13,950,000 for the purchase of the mineral and real property rights, of which $5,325,000 is due by June 15, 2012 and the balance of $5,625,000 is due by April 15, 2013.  Until such time as Metamining Nevada has made these payments, the sellers are holding the deeds in escrow. We do not have the funds necessary to make the June 15, 2012 payment. If we fail to make this payment, we will lose these rights.  In addition, if we are able to either secure the funds necessary to make these payments or otherwise negotiate an extension of the due dates, of which there is no assurance, we will lose all rights to explore these properties and forfeit any funds paid to date.

*We will need to raise between $15 million and $20 million of additional financing to explore and possibly develop the Metamining Nevada properties. If we cannot raise additional capital as needed, our ability to diversify our company could be in jeopardy.*

In addition to the funds necessary to pay for the mineral and property rights, we will also need to raise between $15 million and $20 million of capital to explore these properties and, if the exploration results are favorable, to ultimately develop these properties.  We do not have any firm commitments to provide any additional capital and we anticipate that we will have certain difficulties raising capital given the risks associated with exploration of the mining assets and the history of our company. Accordingly, we cannot assure you that additional capital will be available to us upon terms acceptable to us, if at all.  If we are subsequently unable to raise additional funds as needed, our ability to implement our business plan and grow our company will be in jeopardy and investors risk losing their entire investment.

*Our management may be unable to effectively integrate our two businesses and to manage our growth and we may be unable to*

*fully realize any anticipated benefits of the transaction with Metamining Nevada.*

We are subject to various risks associated with our growth strategy, including the risk that we will be unable to effectively integrate and manage the operations of Linkwell Tech with Metamining Nevada.   The two companies' histories, the geographical location, business models and business cultures are different in many respects.   Our management faces significant challenges in their efforts to integrate these businesses and to effectively manage our continued growth.   There can be no assurance that our efforts to integrate these operations will be successful which may cause increased operating expenses and adversely impact our financial condition in future periods.

**_The feasibility of mining the various Metamining Nevada properties has not been established and there are no assurances that it will be commercially feasible to develop these properties._**

While Metamining Nevada owns various mining rights, it does not record any reserves on its balance sheet. A "reserve," as defined by the SEC rules and regulations, is that part of a mineral deposit that can be economically and legally extracted or produced at the time of the reserve determination.  A reserve requires a feasibility study demonstrating with reasonable certainty that the deposit can be economically and legally extracted and produced. Although a qualified independent engineering firm has completed a pre-feasibility study that concluded there would be minimal risk in proceeding to exploration and development of the Metamining Nevada properties on the basis of estimates of mineralized material, Metamining Nevada has not commissioned nor received feasibility studies or obtained the necessary operating permits with regard to the Metamining Nevada mineral rights. There are numerous risks associated with a pre-feasibility study, including:

• The limited amount of drilling and geologic study completed to date,

• The process testing is limited to historic properties, small pilot plants and bench scale testing,

• The difficulty obtaining expected metallurgical recoveries when scaling up to production scale from pilot plant scale,

• The preliminary nature of the mine plans and processing concepts,

• The rough preliminary operating and capital cost estimates,

> • Metallurgical flow sheets and expected recoveries are in development, and
>
> • The history of pre-feasibility studies typically underestimating capital and operating costs.
>
> Substantial additional feasibility work and expenditures are required to demonstrate economic viability.  The mineralized materials identified to date on these properties have not and may never demonstrate economic viability.  The feasibility of mining has not been, and may never be, established.  Whether a mineral deposit can be commercially viable depends upon a number of factors, including the particular attributes of the deposit, including size, grade and proximity to infrastructure; metal prices, which can be highly variable; and government regulations, including environmental and reclamation obligations. There are no assurances Metamining Nevada will be able to establish some or all of its mineralized material as proven or probable reserves in sufficient quantities to justify commercial operations.

102.    On the same day, Linkwell also filed a Form 8-K/A (amendment no. 2) amending the May 11, 2012 Form 8-K/A to provide a revised disclosure in Note 1 of the previously submitted Audited Financial Statements.   These curative disclosures confirmed that the representations Linkwell made about Metamining Nevada and its business in prior disclosures filed with the SEC were materially misleading.  The revised disclosures (with modifications from the prior underscored and deletions struck through) are as follows:

> Metamining Nevada, Inc. (the "Company") was incorporated in the State of Nevada on March 30, 2011, whose primary business operations are the exploration, mining, and processing of mineral deposits from iron ore resources located in the State of Nevada. The Company is a wholly-owned subsidiary of Metamining Inc., a California corporation, whose principal offices are located at 1065 East Hillsdale Boulevard, Foster City, CA 94404.
>
> Metamining Nevada, Inc. purchased and holds mining rights ~~for some of the largest iron ore resources~~ in the western United States. ~~The Company has plans to make substantial investments to explore, mine, and process these iron ore resources.~~  The Company purchased ~~controls~~ approximately 7.5 square miles of ~~iron~~ properties ~~containing defined resources~~ in the Buena Vista Hills

area of the Mineral Basin Mining District, Pershing and Churchill Counties, of Nevada.

~~The Company's founders have identified and purchased several mineral deposits in northern Nevada. These resources were operating mines at some time since the 1800's, but production had ceased for many years. The Company's founders have plans to restart these mines, applying the latest and most modern mining and refining techniques to meet global demand for iron and steel.~~

The Company is a development stage enterprise, and management has engaged the services of ~~several~~ geologist and engineering consultants to study and report on the mining deposits ~~assets~~, and to develop plans to enable the company ~~firm~~ to explore these mineral deposits ~~capitalize on opportunities to mine and process the iron ore resources.~~ One of the primary mineral deposit sites under the Company's control is Iron Horse Project, which is located 21 miles south of Lovelock, Nevada, in the County of Pershing. ~~Based on historical geological studies, it is estimated that there is 112 million tons of iron ore in surface stockpiles and underground bodies indicated by drilling proven resources, with iron ore grade between 30 to 40% iron. Potential resource estimates are 450 million tons of iron ore, based on examination of magnetic data and local and district geology with a grade of 20 to 30% iron to a depth of 475 feet. The Company engaged the services of certain professional geologist to make a site visit and to compile a Technical Report on February 20, 2011 on Buena Vista Iron Properties in Pershing and Churchill Counties, Nevada. The Report summarized data available as regards past exploration and mining, as well as current identified, inferred and potential iron resources based on available information and geologic interpretations.~~ In August 2011, the Company engaged the services of a ~~certain~~ professional engineering firm to make a site visit and to review existing data, and provide a pre-feasibility study of the mineral ~~iron ore~~ deposits of the Iron Horse Project-Dodge Mine Property ~~located east of Lovelock, Nevada.~~ No exploration work was conducted so that this report relies entirely on work done by past operators and consultants. This Report was ~~is~~ a pre-feasibility study that is not based on significant measured reserves but does show ~~tremendous~~ potential for development of the property. This Report, which was updated in February 2012, only addresses the Dodge Mine Property within the overall Iron Horse Property holdings controlled by Metamining. ~~However, past magnetite studies and other data indicate the potential for very large magnetite deposits on these tracts, in the order of hundreds of million tonnes, possibly over one billion tonnes as described in the geologic report. The Professional Engineers were tasked with the~~

37

~~responsibility to gather and review all available data and to make preliminary assessments and recommendations based on that data, culminating in the "Iron Horse Project - Dodge Mine Pre-Feasibility Study". In that report, the Professional Engineers describe the geological composition and physical characteristics of the property, the opportunities for mining and processing, infrastructure and cost considerations, productivity estimates, and cash flow and rates of return modeling for management's consideration. The study concludes that the Dodge Mine has substantial potential to be a major producer and extremely profitable. The Report completed in August, 2011.~~

103.    On August 20, 2012, Linkwell filed its quarterly report for the period ended June 30, 2012 on Form 10-Q with the SEC.  Unlike the prior Form 10-Q filing for the period ended March 31, 2012, the results of operations from the Company's subsidiary disinfectant business reappeared as Linkwell reported revenue, profit and income for the 3 and 6 months ended June 30, 2012 in its consolidated statements of operations.

104.    As reported by the Company, net sales for the 3 months ended June 30, 2012 were $4.5 million as compared to net sales of $3.8 million for the same period in 2011, an increase of $0.7 million, or approximately 18%.  Net sales for the 6 months ended June 30, 2012 were $7.9 million as compared to net sales of $7.0 million for the 6 months ended June 30, 2011, an increase of $0.9 million, or approximately 12%.  Net income for the 3 months ended June 30, 2012 was $0.7 million compared to $0.1 million for the same period in 2011, an increase of $0.6 million or 647%.  Net income as a percentage of revenue was 15% for the 3 months ended June 30, 2012, while it was 2% for the same period in 2011.  Net income for the 6 months ended June 30, 2012 was $0.6 million compared to net income of $0.5 million for the 6 months ended June 30, 2011, an increase of $0.1 million or 42%. Net income as a percentage of revenue was 8% for the 6 months ended June 30, 2012, while it was 6% for the 6 months ended June 30, 2011.

105.    The consolidated statement provides as follows:

LINKWELL CORPORATION AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE INCOME (LOSS)
(UNAUDITED)

| | For three months ended | | For six months ended | From inception (March 30,2011) to |
| --- | --- | --- | --- | --- |
| | June 30, 2012 | June 30, 2011 | June 30, 2012 | June 30, 2011 |
| Revenues | $ 1,111,092 | $ - | $ 1,111,092 | $ - |
| Revenues-related parties | 3,356,276 | | 3,356,276 | |
| **Total revenues** | 4,467,368 | - | 4,467,368 | |
| Cost of revenues | 2,458,088 | | 2,458,088 | |
| **Gross profit** | 2,009,280 | - | 2,009,280 | - |
| **Operating (expenses) income:** | | | | |
| Selling expenses | 293,193 | - | 293,193 | - |
| General and administrative expenses | 840,642 | 5,305 | 862,662 | 30,968 |
| **Total operating expenses** | 1,133,835 | 5,305 | 1,155,855 | 30,968 |
| **Income (loss) from operation** | 875,445 | (5,305) | 853,425 | (30,968) |
| **Other (expenses) income:** | | | | |
| Other income | 33,258 | - | 33,258 | - |
| Interest income | 389 | - | 389 | - |
| Interest expense | (25,362) | - | (25,362) | - |
| **Total other income (expense)** | 8,285 | | 8,285 | |
| **Net income (loss) before income taxes** | 883,730 | (5,305) | 861,710 | (30,968) |
| Income tax expense | (199,090) | - | (199,090) | - |
| **Net income (loss)** | 684,640 | (5,305) | 662,620 | (30,968) |
| Less: Net income to non-controlling interests | 81,500 | - | 81,500 | - |
| **Net income (loss) to common stockholders** | $ 603,140 | $ (5,305) | $ 581,120 | $ (30,968) |
| | | | | |
| **COMPREHENSIVE INCOME (LOSS):** | | | | |
| Net income (loss) | 684,640 | (5,305) | 662,620 | (30,968) |
| Foreign currency translation adjustments | (89,448) | - | (89,448) | - |
| **Comprehensive income (loss)** | $ 595,192 | $ (5,305) | $ 573,172 | $ (30,968) |
| | | | | |
| **Basic and diluted income per common share:** | | | | |
| Basic | $ 0.01 | $ - | $ 0.00 | $ - |
| Diluted | $ 0.01 | $ - | $ 0.00 | $ - |
| | | | | |
| Basic weighted average common shares outstanding | 119,605,475 | - | 119,605,475 | - |
| Diluted weighted average common shares outstanding | 119,605,475 | - | 119,605,475 | - |

106.    Metamining Nevada still had no operations during the 6 months ended June 30, 2012.

107.    The Form 10-Q filing disclosed that, on July 26, 2012, the Metamining, Metamining Nevada and the Sellers of the Nevada Properties executed a second extension

agreement (the "Second Extension Agreement").  Pursuant to its terms, Metamining Nevada (which has no assets) will pay the Sellers bi-monthly an amount equal to the greater of: (a) 40% of net profits from the trading of iron ore off-take which Metamining will realize from its Mobile, Alabama project, or (b) a fixed minimum payment of $400,000.  When Metamining Nevada has completed its private placement fund raising, it shall pay 15% of the proceeds from private placement for mineral rights payments to Sellers immediately after the receipt of the raised funds.  The bi-monthly payments shall begin on the Commencement Date.  Metamining Nevada will determine the exact Commencing Date no later than August 25, 2012.  The Commencing Date for payments shall start no later than November 25, 2012.  If the Mobile, Alabama project is not operational by November 25, 2012, the date may be extended again by mutual agreement.

108.   The parties confirmed under the Second Extension Agreement to extend the second installment of $5,625,000.00 to a period of 15 months starting on the November 25, 2012, with the remainder of the Second Installment, if any, due no later than at the end of the of the 15 month period.  The bi-monthly payment of the third installment of $5,325,000.00 shall start in the next month after the completion of the second installment.  Metamining Nevada shall pay off the balance of the installments in 30 months from the Commencing Date by paying the remainder of the third installment, if any, no later than the due date of the last payment in the 15 month period.

109.   The Form 10-Q filing, in the section under Management's Discussion and Analysis of Financial Condition and Results of Operation, finally offered an explanation as to why the Company acquired Metamining Nevada.  Notably, Linkwell admitted, for the *first* time,

that Xuelian, Wei, Song and Ling never contemplated the integration of the new mining business with the Company's historical disinfectant business in China.  As set forth in the filing:

> The Company entered into the transaction with Metamining Nevada to expand its operations into the mining and trading business, which management believes represents undervalued mining assets with an opportunity for strong market diversification and revenue growth. … During the discussions leading up to the acquisition, it was generally agreed between the Company's management and Metamining that the Company could utilize its status as a public company to raise capital through equity offerings.  Metamining is now a principal shareholder of the Company and Song Qiang Chen, the control person of Metamining, has subsequently joined the Company's board of directors. By virtue of the foregoing, the Company's management expects that Metamining and its principals will continue to assist the Company in accessing capital to fund the payments on the mining rights until such time as the Company is able to undertake a sale of equity to provide the balance of these funds, together with the additional capital necessary to develop the assets. Once the Company has completed the reverse stock split, it expects to begin discussions with current shareholders in an effort to raise the first phase of the necessary capital which we expect that will be followed by a larger private placement. However, at this time, the Company has no firm commitments for this additional capital. *The Company is currently evaluating its business strategy as to whether to continue the historical Company business while diversifying its operations in the mining business in order to create shareholder value through the potential growth expected in the mining and trading business.* (Emphasis added).

110.    Linkwell provided a similar answer in a September 11, 2012 letter to the SEC staff.  Linkwell was asked in an August 14, 2012 comment letter to explain the underlying drivers that led management of the Company's historical operations to enter into the transaction with Metamining Nevada given that the operating status of the historical disinfectant business was much more advanced than the mining and trading business of Metamining Nevada, and the fact that these two business activities are substantially dissimilar.  The Company was also asked to explain the underlying reasons that led to historic management relinquishing control and principal ownership to Metamining.

41

111.    Linkwell failed to provide any meaningful response to the latter question.  With

respect to the former question, it stated in its response to the comment letter as follows:

> While the Company's historic operations have been profitable, the
> Company has been unable to generate any market interest in its
> stock solely based upon its disinfectant business within China. …
> The Company's historic management believes there may be more
> growth potential for the Company with a business in which its
> operations are based in the U.S. The historic management is also
> cognizant of the concerns of many U.S. investors regarding the
> integrity of primarily PRC-based companies and believes the
> Company may be better received with operations not solely based
> in the PRC.  Therefore, the Company's diversification strategy for
> future growth and to maximize its market potential in the U.S. and
> international markets involves its commitment to mineral
> exploration and trading emanating in the U.S. which management
> believes has greater potential in terms of higher revenues and
> profitability for its shareholders over the long term.  Management
> believes that there is a greater demand for iron ore minerals in the
> international market than there is in the Company's disinfectant
> business which resides exclusively in the Chinese market and is
> concentrated in related parties' transactions.  Additionally, the
> Company's management believes that acceptance of the Company
> by U.S. investors would be significantly improved in the stock
> market and in its growth potential within a new international
> business if the Company is controlled by a U.S. based company,
> namely Metamining.

112.    On September 11, 2012, Linkwell filed a Preliminary Information Statement on

Schedule 14C which, again, disclosed the adoption and approval by the Board of the Articles of

Amendment.

113.    This Information Statement contained substantially the same representations as

those set forth in the prior July 26, 2012 Information Statement.

114.    On September 11, 2012, Linkwell also filed a second amendment to its quarterly

report for the period ended March 31, 2012 on Form 10-Q/A.  The amendment was filed in

response to comments for the staff of the SEC and submitted to, among other things, remove all

references to Metamining Nevada as a "development stage" company.

42

115.    On the same day, Linkwell also filed a Form 8-K/A (amendment no. 2) amending the May 11, 2012 Form 8-K/A to provide a revised disclosure in Note 1 of the previously submitted Audited Financial Statements.   These curative disclosures again confirmed that the representations Linkwell made about Metamining Nevada and its business in prior disclosures filed with the SEC were materially misleading.   The revised disclosures (with modifications from the prior underscored and deletions struck through) are as follows:

> Metamining Nevada, Inc. (the "Company") was incorporated in the State of Nevada on March 30, 2011, whose primary business operation are is the exploration, mining, and processing of mineral deposits from iron ore resources located in the State of Nevada. The Company is a wholly-owned subsidiary of Metamining Inc., a California corporation, whose principal offices are located at 1065 East Hillsdale Boulevard, Foster City, CA 94404.

> Metamining Nevada, Inc. purchased and holds mining rights in the western United States.  The Company purchased approximately 7.5 square miles of properties in the Buena Vista Hills area of the Mineral Basin Mining District, Pershing and Churchill Counties, of Nevada.

> Metamining Nevada is an exploration state company.  The Company is a development stage enterprise, and management has engaged the services of geologist and engineering consultants to study and report on the mineral deposits, and to develop plans to enable the company to explore these mineral deposits.  One of the primary mineral deposit sites under the Company's control is Iron Horse Project, which is located 21 miles south of Lovelock, Nevada, in the County of Pershing.  In August 2011, the Company engaged the services of a professional engineering firm to make a site visit and to review existing data, and provide a pre-feasibility study of the mineral deposits of the Iron Horse Project Dodge Mine Property.  No exploration work was conducted so that this report relies entirely on work done by past operators and consultants.  This Report was a pre-feasibility study that is not based on significant measured reserves but does show potential for development of the property.  This Report, which was updated in February 2012, only addresses the Dodge Mine Property within the overall Iron Horse Property holdings controlled by Metamining.

116.    On October 25, 2012, Linkwell filed a Definitive Information Statement on Schedule 14C announcing the adoption and approval by the Board of the Articles of Amendment.  The Articles of Amendment, which are annexed to the Information Statement, specify that the effective date for the 1 for 200 reverse stock split is November 16, 2012.

117.    The Information Statement represented that "the holders of 60.1% of our outstanding voting securities have approved these actions on October 10, 2012, by written consent in lieu of a special meeting of shareholders in accordance with the relevant provisions of the Florida Business Corporations Act."  The holders of the voting securities that were stated to have approved these actions by written consent in lieu of a special meeting include Xuelian, Wei and Song, Metamining and CD Defendants.

118.    The Information Statement set forth, however, the same reason for the 1 for 200 reverse stock split: the belief by the Board that the "current low price of our common stock negatively impacts our credibility as a viable business enterprise"; the "need to raise significant additional capital to fund our operations following the transaction with Metamining Nevada"; and "that the relatively low per-share market price of our common stock adversely impacts the ability of our company to raise the necessary funds and impairs the acceptability of our common stock to members of the investing public, including institutional investors."

119.    According to this filing, the closing price of the Company's stock on October 23, 2012 was $0.005 per share.  On February 22, 2012, prior to the announcement of the Transaction, the Company's stock was $0.10 per share.

120.    On November 15, 2012, Linkwell filed a Form 8-K with the SEC announcing a change of control of registrant.

44

121.    The filing also advised shareholders that the effective date for the 1 for 200 reverse stock split is November 16, 2012, giving Metamining absolute voting control.

**E.      The Anticipated Spinoff of Linkwell Tech and LiKang Disinfectant**

122.    As a result of the business conducted by its operating subsidiaries in China, Linkwell had, as of December 31, 2011, cash and cash equivalents of $2,919,670, accounts receivable of $12,651,347, total assets of $27,446,588, total liabilities of $10,012,087, total stockholders' equity of $17,434,501, and working capital of $1,997,311 with no material commitments for capital expenditures.  To date, none of the Company's liquidity or capital resources have been utilized for the purposes of making any of the payments due under the Purchase and Sale Agreements.

123.    As of October 10, 2012, Xuelian and Wei, who beneficially owned 46,023,470 shares of the Company's common stock, or approximately 38.5% of the shares outstanding, voted to approve the 1 for 200 reverse stock split which, on the effective date when coupled with the Transaction, would reduce their equity to less than 3% of the shares outstanding.

124.    Given the Company's commitment to develop its new mining business in the U.S., to the exclusion of the disinfectant business which is exclusively in China, and the longstanding positions Xuelian and Wei maintain at Linkwell Tech and LiKang Disinfectant, upon information and belief, Xuelian and Wei agreed to drastically reduce their interests in Linkwell from 38.5% to less than 3%, in exchange for the undisclosed transfer of all or substantially all of the Company's stock in operating subsidiaries Linkwell Tech and LiKang Disinfectant to them or entities controlled by or affiliated with them, which appeared to have been previously done when the assets and operations disappeared from Linkwell's financial statements filed with the SEC.  This financial data subsequently reappeared accompanied by

45

statements indicating that they would dispose of the Linkwell historic assets and business as more fully described above.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against Director Defendants)

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    Xuelian and Wei had duty to act in good faith, with due care, and in the best interests of Linkwell.

127.    Xuelian and Wei violated their fiduciary duties of good faith, due care, loyalty and diligence in the management and administration of the Company's affairs, as well as in the use and preservation of its property and assets by: (a) entering into the Transaction; and (b) subsequently ratifying and confirming the Transaction.

128.    During the Relevant Period, Xuelian and Wei caused Linkwell to enter the Transaction with Metamining.  The Share Exchange Agreement was executed by Xuelian, in his capacity as Chief Executive Officer of Linkwell.   The execution of the Share Exchange Agreement was ratified by the Board, then composed solely of Xuelian and Wei.

129.    Xuelian and Wei, as members of the Board, subsequently ratified the Transaction.

130.    Xuelian and Wei breached their fiduciary obligations to Linkwell by failing to obtain a fairness opinion in connection with the Transaction which would have shown that acquisition of Metamining Nevada (a shell company with no assets, operating personnel or operations, and an unfunded $14,250,000 obligation) in exchange for an approximately 88% controlling interest in Linkwell, at no or grossly inadequate cost to the acquirers, was not in the Company's interest.

46

131.    Xuelian and Wei also breached their fiduciary obligations to Linkwell by agreeing with the other Defendants that the *quid pro quo* for authorizing the Transaction was that all of the "historic" Linkwell would be secretly transferred to them or entities they control or are affiliated with, thus, enriching themselves at the expense of the Company.

132.    The Transaction was subsequently ratified by Song and Ling, who joined the Board on March 30, 2012, and with Xuelian and Wei, unanimously adopted and approved the 1 for 200 reverse stock split, on of the vehicles used to accomplish the complete change of control to Metamining.   In ratifying the Transaction, Song and Ling (who simultaneously served as directors of Metamining) breached their fiduciary duties to Linkwell by confirming the issuance of approximately 88% of the Company's equity to Metamining for no meaningful consideration and without obtaining a fairness opinion.

133.    Each of the Director Defendants had a duty to ensure that Linkwell disseminated accurate, truthful and complete information to its shareholders.

134.    Each of the Director Defendants violated their fiduciary duties of good faith, due care and loyalty by causing the Company to disseminate to Linkwell shareholders materially misleading information in the Company's public filings.   These actions could not have been a good faith exercise of prudent business judgment.

135.    During the Relevant Period, Xuelian, Wei, Song and Ling approved the issuance by Linkwell of preliminary and definitive Information Statements filed on SEC Schedules 14C on May 29, 2012, July 26, 2012, September 11, 2012 and October 25, 2012 (collectively, the "2012 Information Statements"), that were materially inaccurate because they failed to disclose highly material facts and circumstances concerning the Transaction.   Each of the 2012 Information Statements was intended to provide the Company's public shareholders with notice

of the adoption of the Articles of Amendment by written consent of the Board and the majority shareholders of Linkwell in lieu of a special meeting of shareholders.  Thus, each member of the Board was duty-bound to disclose all information material to the corporate actions.

136.   Despite their fiduciary obligations, each of the Director Defendants caused Linkwell to file and disseminate the 2012 Information Statements referenced above which uniformly failed to disclose material information to the Company's public shareholders.  The 2012 Information Statements were materially inaccurate and incomplete because, among other things, they omitted to disclose that:

a.   The Board failed to obtain written consents from the majority holders of the Company's outstanding voting securities to adopt and approve the Articles of Amendment without a special meeting of shareholders, despite representing otherwise in the Preliminary Information Statements filed with the SEC on May 29, 2012, July 26, 2012 and September 11, 2012.  With respect to the foregoing Information Statements, no shareholder consent was executed, nor did Linkwell intend to obtain the written consent of the majority shareholders until immediately prior to the filing of the definitive information statement.

b.   The purpose of the 1 for 200 reverse stock split was not intended to assist Linkwell to fund its operations following the acquisition of Metamining Nevada.  As subsequently stated by the Company, the 1 for 200 reverse stock split was not integral to the acquisition of Metamining Nevada, or the immediate funding of operations.

c.   The reasons why Linkwell determined to fundamentally change its business model was to be in a position to spinoff its operating subsidiaries conducting the disinfectant health case products business in China to Xuelian and Wei and give Metamining

48

total control of a fully reporting SEC company with a number of public shareholders so Metamining could be in a position to raise money through the U.S. capital markets.

        d.     Ecolab has a call right entitling it to purchase all of the Company's equity interests in its historically profitable operations, including Linkwell Tech and LiKang Disinfectant when there is a change of control at Linkwell.

        e.     Wholly owned subsidiaries of CD Int'l, Capital One and China Direct served as consultants for Linkwell and Metamining during the negotiations of the Transaction and received 10,000,000 shares of Linkwell common and 581,976 shares Series C preferred stock as compensation for the consulting services provided.

        f.     CD Int'l, Capital One and China Direct had an impermissible conflict of interest since they served as consultants to all parties in the Transaction. Capital One served as the Company's consultant. China Direct, who had a historical consulting relationship with Linkwell dating back to 2005, served as Metamining's consultant.

     137.    By reason of their positions as fiduciaries of Linkwell, Xuelian, Wei, Song and Ling owed the Company and its public shareholders duties of good faith and loyalty and truthful disclosure. Each of the Director Defendants consciously violated and breached these duties by approving the Company's submission of materially misleading financial statements and press releases to the SEC in connection with the Transaction. As detailed above, these public filings were materially misleading insofar as they:

        a.     Misrepresented or omitted material facts describing the business and prospects of Metamining Nevada in press releases and filings with the SEC;

        b.     Misrepresented or omitted to state that one of the true purposes of the Transaction was to divest the Company of its only valuable assets: the stock certificates

representing its 90% interests in Linkwell operating subsidiaries with the substantial assets, sales and earnings;

        c.      Failed to disclose the interests of Xuelian and Wei in the Transaction; and

        d.      Failed to disclose material terms to the Transaction, including, but not limited to, certain preemptive rights and transfer restrictions possessed by Ecolab to acquire all of the Company's operating subsidiaries in China upon a change in control at Linkwell.

    138.    Each of the Director Defendants engaged in *ultra vires,* unlawful and/or fraudulent acts and breached their fiduciary obligations to Linkwell by:

        a.      Attempting to wrongfully divest the Company of its 90% interest in the historical Linkwell operating subsidiaries without ensuring that the Company received fair value for those assets;

        b.      Using their status as the shareholders in control of Linkwell:

            i.      To dilute by approximately 90% of the existing shareholders' equity interests in the Company by entry into the Transaction for little or no consideration from Metamining; and

            ii.      By attempting to secretly "dispose" of the substantial assets and operations of Linkwell Tech and LiKang Disinfectant and deliver them to Xuelian and Wei for no consideration; and

        c.      As both directors and shareholders, in actively engaging in efforts to cover up their misconduct by submitting materially misleading public filings with the SEC.

    139.    This conduct of each of the Director Defendants constitutes actual omissions involving breach of duty and/or breach of trust.

140.    Each of the Director Defendants have violated duties of care, loyalty, candor and independence owed to Linkwell and its public shareholders, have engaged in unlawful self-dealing and have acted to place their personal interests and/or their co-conspirators' interests ahead of the interests of Linkwell and its public shareholders.

141.    Each of the Director Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Linkwell and its public shareholders, and they failed to disclose material information and/or made material misrepresentations or omissions of fact to shareholders regarding the Transaction.

142.    Each of the Director Defendants' breaches of fiduciary duty constituted an abuse of their ability to control and influence Linkwell, for which they are legally responsible.

143.    Each of the Director Defendants had a fiduciary duty to Linkwell and its shareholders not to issue approximately 90% of its equity for no or grossly inadequate consideration.

144.    Each of the Director Defendants had a duty to Linkwell and its shareholders to prudently supervise, manage and control the assets, business and operations at Linkwell.

145.    By their actions, each of the Director Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the duties imposed upon them by Florida law.  By engaging in the misconduct alleged herein, each of the Director Defendants breached their duties of care, diligence and candor in the management and administration of the affairs of Linkwell and in the use and preservation of the Company's assets.

146.    As a direct and proximate cause of Director Defendants' breaches of fiduciary duty, Linkwell suffered significant damages, and will continue to sustain substantial harm,

especially if Linkwell again attempts to dispose of its equity interest in the two Chinese disinfectant subsidiaries for no or grossly inadequate consideration.

147.    Director Defendants are liable to the Company in an amount to be proven at trial, including, but not limited to, the fair value of a 94% equity interest in Linkwell as of March 31, 2012, and, if already disposed of, the fair value of Linkwell's interest in its two 90% owned Chinese disinfectant subsidiaries.

## COUNT II

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Metamining and CD Defendants)

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    As described above, Metamining and CD Defendants aided and abetted one or more of the Director Defendants in breaching fiduciary duties owed to Linkwell and its public shareholders.

150.    Metamining and CD Defendants aided and abetted and rendered substantial assistance in the wrongful conduct complained of in paragraphs 125-45 above.  In taking such actions to substantially assist the commission of the wrongdoing complained of, Metamining and CD Defendants acted with knowledge of the primary wrongdoing, and were aware of their overall contribution to and furtherance of the wrongdoing.

151.    Metamining and CD Defendants provided material support to the Director Defendants in connection with the Transaction.  As acknowledged by the Company in 2011 Form 10-K filing, Director Defendants are and were heavily reliant upon the consulting and advisory services provided to them by CD Defendants.  Both Metamining and CD Defendants knew that Xuelian, Wei, Song and Ling, as members of the Board, owed fiduciary duties to

Linkwell and its public shareholders and were acting in breach of those duties when they ratified the Transaction, issued shares of the Company for inadequate consideration without ever obtaining a fairness opinion and agreed to and permitted the disposal of all of the meaningful assets of Linkwell for no consideration.

152.    Metamining provided substantial assistance to Director Defendants by, among other things:

a.    Agreeing, through Song and Ling, to be a party to the Share Exchange Agreement;

b.    Appointing Song and Ling to the Board to ratify the Transaction;

c.    Agreeing to the undisclosed plan to transfer of the Company's historical assets, to wit: 90% of the stock in Linkwell Tech and LiKang Disinfectant to Xuelian and Wei for no consideration;

d.    Never funding Metamining Nevada with cash and/or other assets necessary to satisfy the Purchase Price for the Nevada Properties; and

e.    Providing materially misleading information to Linkwell concerning Metamining Nevada's business and prospects for inclusion in the Company's public filings.

153.    CD Defendants provided substantial assistance to Director Defendants by, among other things:

a.    Delivering Linkwell to Metamining for the purposes of effecting the Transaction;

b.    Providing consulting and advisory services to both Linkwell and Metamining in connection with structuring the Transaction, despite the existence of a clear conflict of interest; and

53

c.     Preparing and reviewing the Company's public filings for submission to the SEC which they knew, or should have known, were materially false and misleading.

154.   Upon information and belief, CD Defendants were also involved in the decision to effect the 1 for 200 reverse stock split, the timing of the effective date for the split and the undisclosed plan to transfer of the Company's substantial assets and operations to Xuelian and Wei for no consideration.

155.   Additionally, CD Defendants were highly compensated for their substantial assistance.  CD Defendants served as consultants and advisors to both Linkwell and Metamining in connection with the Transaction.  Linkwell, however, paid both Capital One and China Direct for the services rendered in connection with the Transaction.  Capital One was paid 10,000,000 shares of the Company's common stock (or 50,000 shares after the 1 for 200 reverse stock split), consistent with the long-term consulting relationship Linkwell had with China Direct, as described in paragraphs 35-36 and 91-92 above.  China Direct was paid substantially more in connection with the closing of the Transaction.  It received 581,973 shares of the Company's Series C convertible preferred stock, as described in paragraphs 74, 91 and 93 above.  By comparison, after the 1 for 200 reverse stock split, the Company had 598,027 shares of common stock issued and outstanding.

156.   As a direct and proximate result of Metamining's and CD Defendants' aiding and abetting breaches of fiduciary duty, Linkwell has suffered significant damages, and will continue to sustain substantial harm.

157.   Metamining and CD Defendants are liable to the Company in an amount to be proven at trial, including, but not limited to, the fair value of a 94% equity interest in Linkwell as

of March 31, 2012, and, if already disposed of, the fair value of Linkwell's interest in its two 90% owned Chinese disinfectant subsidiaries.

## COUNT III

### CONSTRUCTIVE FRAUD
### (Against Director Defendants)

158.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.   Xuelian, Wei, Song and Ling, as officers and director of Linkwell, owe fiduciary duties to the Company and its public shareholders. Thus, each of the Director Defendants has a fiduciary relationship relative to the Company.

160.   Each of the Director Defendants abused their fiduciary relationship with Linkwell such that an unconscionable advantage has been taken to the detriment of the Company. Each of the Director Defendants abused their fiduciary relationship with Linkwell by:

a.   Approving and ratifying the Transaction for no or inadequate consideration, and, in particular, as described in paragraphs 3-5, 68, 71-83, 100-02, 106-08, 115, 127, 130 and 132 above;

b.   Authorizing the undisclosed transfer of Linkwell's operating assets and business to Xuelian and Wei, or entities controlled by Xuelian and Wei, and, in particular, as described in paragraphs 6-7, 85, 109-10, 122-24, 131 and 138 above; and

c.   Causing Linkwell to submit materially misleading financial statements, information statements and press releases concerning the Transaction with the SEC, and, in particular, as described in paragraphs 85, 89-91, 96, 98-102, 104-05, 112-13, 115, 118 and 134-38 above.

161.    Each of the Director Defendants was a participant in a scheme to defraud Linkwell by wrongfully issuing approximately 90% of the Company's equity to Metamining in order to gain control of the Company's valuable assets and operations for inadequate consideration.

162.    Each of the Director Defendants approved and/or ratified the Transaction; each of the Director Defendants approved and/or ratified the issuance of shares of common and Series C convertible preferred stock to Metamining and CD Defendants in connection therewith.

163.    Each of the Director Defendants agreed that integral to the Transaction was the secret transfer of all of the assets and operations of the Company's subsidiary disinfectant business to Xuelian and Wei for no consideration.

164.    Xuelian, Wei, Song and Ling, through the abuse of the fiduciary relationship, have taken an improper advantage of Linkwell.  Approximately 94% of the equity interest in the Company has been transferred to Metamining and CD Defendants in exchange for 100% of Metamining Nevada – a company with no assets or operations and a contractual obligation of more than $14,000,000.  Moreover, Xuelian, Wei, Song and Ling have agreed to the undisclosed transfer of the Company's 90% stock interest in Linkwell Tech and LiKang Disinfectant for no consideration.

165.    As a direct and proximate result of such misconduct, the Company has suffered significant damages, and will continue to sustain substantial harm.

166.    Director Defendants are liable to the Company in an amount to be proven at trial, including, but not limited to, the fair value of a 94% equity interest in Linkwell as of March 31, 2012, and, if already disposed of, the fair value of Linkwell's interest in its two 90% owned Chinese disinfectant subsidiaries.

## COUNT IV

### CIVIL CONSPIRACY
### (Against Director Defendants, Metamining and CD Defendants)

167.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    Xuelian, Wei, Song, Ling, Metamining and CD Defendants conspired with one another to defraud Linkwell and, in particular, as described in paragraphs 10, 35-37, 40, 63, 71-80, 82-87, 89-94, 96, 98-102, 108-13 and 124 above, by agreeing to the issuance of approximately 90% of the Company's equity to a shell company with no meaningful assets and a $14,250,000 financial obligation for no or grossly inadequate consideration; as the *quid pro quo*, authorized the subsequent transfer of these substantial assets and operations to Xuelian and Wei for no consideration; and disguised their misconduct by submitting materially misleading public filings with the SEC concerning the Transaction.

169.    Xuelian, Wei, Song, Ling, Metamining and CD Defendants agreed to perpetrate the constructive fraud upon Linkwell. Upon information and belief, CD Defendants and Metamining solicited and/or advised Xuelian and Wei to undertake the Transaction on terms designed solely to benefit CD Defendants, Metamining, Xuelian, Wei, Song and Ling.

170.    In furtherance of the conspiracy, the following actions were undertaken:

a.    Xuelian, Wei, Song and Ling executed the Share Exchange Agreement;

b.    CD Defendants received 10,000,000 shares of the Company's common stock and 581,973 shares of Series C convertible preferred stock as compensation for services rendered in connection with the Transaction;

c.    CD Defendants prepared and/or reviewed public filings for submission to the SEC in connection with the Transaction, which were materially false and misleading;

57

d.      Xuelian, Wei, Song and Ling approved of the submission of materially misleading public filings to the SEC concerning the Transaction; and

e.      The results of operations from the Company's subsidiary disinfectant business was removed from the consolidated statements of operations and comprehensive income of Linkwell, and only reappeared after the receipt of Plaintiff's Demand Letter and/or the SEC staff comments to the Company's filings, accompanied and followed by subsequent disclosures indicating that Linkwell would again dispose of these assets.

171.    As a direct and proximate result of the foregoing misconduct, the Company has suffered significant damages, and will continue to sustain substantial harm.

172.    Director Defendants, Metamining and CD Defendants are liable to the Company in an amount to be proven at trial, including, but not limited to, the fair value of a 94% equity interest in Linkwell as of March 31, 2012, and, if already disposed of, the fair value of Linkwell's interest in its two 90% owned Chinese disinfectant subsidiaries.

## COUNT V

### UNJUST ENRICHMENT
### (Against Defendants Song, Ling, Metamining and CD Defendants)

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    By their wrongful acts and omissions, Song, Ling, Metamining and CD Defendants were unjustly enriched at the expense of and to the detriment of the Company. By approving the Transaction, Director Defendants gave away approximately 94% of Linkwell at no cost to Metamining, while at the same time saddling the Company with an obligation to pay in excess of $14,000,000 for the Nevada Properties, without having any cash or other assets in Metamining Nevada.

175.     Plaintiff, as a shareholder and representative of Linkwell, seeks rescission of the Transaction, an order of this Court disgorging all profits, benefits and other compensation obtained by Song, Ling, Metamining and CD Defendants from their wrongful conduct, and other relief for the Company, in an amount to be proven at trial.

## COUNT VI

### CONSTRUCTIVE TRUST
### (Against Director Defendants and Metamining)

176.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.     In the alternative and/or in conjunction with the relief requested above, Plaintiff seeks the establishment and imposition of a constructive trust on the stock certificates Linkwell Tech and LiKang Disinfectant, reflecting 90% of the equity of those companies are property which belongs to Linkwell.

178.     Director Defendants owe fiduciary duties to Linkwell and its shareholders.

179.     By agreeing to secretly transfer the Company's 90% equity interest in its disinfectant subsidiary business to Xuelian and Wei without consideration, as set forth in paragraphs 6-7, 85-87, 109, 122-24, 131 and 138 above, Director Defendants took advantage of their fiduciary relationship as managers of the Company.

180.     Director Defendants "corrected" the Company's SEC filing to disclose the reappearance of those assets and operations after receipt of the Demand Letter and/or the SEC staff comments.  However, the Company's Form 10-Q filing for the quarter ended June 30, 2012 gives every indication that the Director Defendants intend to accomplish the objectives of their agreement and discontinue its historical disinfectant business.  Permitting Director Defendants to transfer the Company's equity interests in Linkwell Tech and LiKang Disinfectant to Xuelian,

Wei or any other person or entity, without adequate consideration would also constitute an abuse of their fiduciary relationship as managers of Linkwell.

181.    Equity demands that a constructive trust should be imposed to hold the stock certificates Linkwell Tech and LiKang Disinfectant until such time as Linkwell obtains fair value for those assets.

## COUNT VII

### ATTORNEYS' FEES
### (Against All Defendants)

182.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

183.    This is a shareholders derivative action brought pursuant to Section 607.07401 of the Florida Statutes.

184.    Plaintiff has had to retain counsel to bring this action because the Board is grossly conflicted and has refused to take any action in response to the Demand Letter to recover the substantial damages sustained by Linkwell.

185.    Pursuant to Subsection (6), the Court "may award reasonable expenses for maintaining the proceeding, including reasonable attorney's fees, to a successful plaintiff or to the person commencing the proceeding who receives any relief …."

186.    Plaintiff requests a statutory award of attorney's fees in connection with any relief obtained on behalf of Linkwell in connection with this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

a.      Determining that his suit is a proper derivative action and designating Plaintiff as an appropriate representative of Linkwell for said action;

60

b.      Awarding damages against Defendants, as specified above in each of the Counts, and in favor of Linkwell, for the injuries sustained by the Company as a result of Defendants' breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty constructive fraud, civil conspiracy and unjust enrichment and reserving the right to seek punitive damages against the appropriate Defendants upon an appropriate showing in the record;

c.      Determining that all Defendants are liable to Linkwell for all damages caused by them, rescinding the Transaction and disgorging all profits and benefits obtained by Defendants by reason of the wrongs alleged herein;

d.      Requiring all Director Defendants to return to the Company all fees, monies and property received by them in their capacities as directors of Linkwell during the Relevant Period;

e.      An Order directing Linkwell to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations, as well as all applicable laws designed to detect and prevent a recurrence of the damaging events alleged herein;

f.      Directing each of the Defendants to pay interest at the highest rate allowable by law on the amount of damages sustained by the Company as a result of that Defendant's culpable conduct;

g.      Imposing a constructive trust to hold the share certificates of Linkwell Tech and LiKang Disinfectant owned by the Company until such time a determination is made to award Linkwell fair value for those assets;

   h. Awarding to Plaintiff, pursuant to Section 607.07401(6) of the Florida

Statutes, the costs and disbursements of this action, including reasonable attorneys' and experts'

fees, costs and expenses; and

    i. Granting such other and further relief as the Court may deem just

and proper.

Dated: December 26, 2012

           **FISCHLER & FRIEDMAN, P.A.**

      By: _Lisa K Bennett_

         Lisa K. Bennett
         Attorney Bar Number: 392960
         1000 South Andrews Avenue
         Fort Lauderdale, FL 33316
         (954) 763-5778

         *Attorneys for Plaintiff*

Of Counsel:

Charles J. Hecht
N.Y.S Attorney Registration No. 1107986
Malcolm T. Brown
N.Y.S Attorney Registration No. 2918498
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
(212) 545-4600

/705548

## VERIFICATION

I, Frederick Siegmund, declare that I have reviewed the complaint ("Complaint") prepared on behalf of Linkwell Corporation, and I authorize its filing.  I have reviewed the allegations made in the Complaint, and to those allegations to which I have personal knowledge, I believe those allegations to be true.  As to those allegations to which I do not have personal knowledge, I rely on my counsel, as well as the investigation conducted by myself and my counsel, and for that reason believe them to be true.  I further declare that I am a current holder, and have been a holder, of common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint occurred.

Dated:  December 18, 2012

_____
FREDERICK SIEGMUND